UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

KYAN WASHINGTON,

                          Plaintiff,

      – *against* –

CORRECTION OFFICER O'MAHONY,
CAPTAIN TRUTA, CAPTAIN
SMALLS, *and* THE CITY OF NEW
YORK,

                    Defendants.

**OPINION & ORDER**

16 Civ. 9546 (ER)

R<small>AMOS</small>, D.J.:

     Kyan Washington, proceeding *pro se*, commenced this action on December 8, 2016,

bringing claims related to an incident that took place in February 2014 while he was a pre-trial

detainee at Otis Bantum Correction Center on Rikers Island. Doc. 2. Before the Court is

Defendants' motion for summary judgment on all claims. Doc. 52. For the following reasons,

the motion is GRANTED.

## I.    BACKGROUND

### A.  Factual Background

     On February 5, 2014, Washington was incarcerated at the Otis Bantum Correctional

Center on Rikers Island. Doc. 62 ¶ 1. He was housed in "Post 2 Lower B," and assigned a bed

at the very back of the dormitory. *Id.* ¶¶ 2, 4. At about 9:25 p.m., Correction Officer O'Mahony,

who was working the evening tour, observed Washington being assaulted while he was sleeping.

*Id.* ¶¶ 2–5, 11. The officers' station was on the opposite end of Washington's bed. *Id.* ¶ 4.

Washington remembers being assaulted by multiple inmates, while O'Mahony reports observing

only one inmate, Kenneth Meeks, assaulting Washington. *Id.* ¶ 5. In any event, O'Mahony gave

several verbal orders to cease fighting and activated her personal body alarm. *Id.* ¶ 7.

Washington maintains that these orders could not have been directed towards him, as he was not

fighting and was clearly the victim of an assault. *Id.* A team of officers, responding to

O'Mahony's personal body alarm, arrived either shortly before or after the altercation ended.  *Id.* ¶ 8.  The altercation lasted approximately two minutes.  *Id.* ¶ 6.

Defendants maintain that Meeks and Washington were subsequently escorted from the dormitory to the intake area, where Captain Truta was working.  Doc. 55 ¶ 8.  While in the intake area, Captain Williams, who is not named as a defendant, sought to obtain a written statement from Meeks, who refused.  Doc. 69 ¶ 31.  According to Williams, Meeks stated instead "Yea I had a fight but Im [*sic*] not gonna write that; it is what it is."  Doc. 62 ¶ 31.  Washington reports, though Defendants contest, that Williams did not seek to obtain a written statement from him as well.  Doc. 69 ¶ 31.  (Washington eventually provided a written statement, three-days after the incident.  *Id.* ¶ 32.)

Defendants report that Meeks was brought to the clinic at 12:55 a.m and remained there for approximately fifteen minutes.  Doc. 55 ¶ 9.  After Meeks left the clinic, according to Defendants, Washington was brought in at approximately 1:20 a.m.—nearly four hours after the incident—and remained there until about 2:45 a.m.  *Id.* ¶ 10.  Washington never saw Meeks in the intake area, and states that he was taken into the clinic at 1:25 a.m., not 1:20 a.m.  Doc. 62 ¶¶ 9–10.  He also states that he was "in obvious and visible pain that he complained of non-stop," but was ignored.  Doc. 63 at 4.  After being seen at the clinic, Washington was taken to the emergency room at approximately 2:50 a.m.  Doc. 62 ¶¶ 12–13.  Washington maintains that "the Physician Assistant called 911 for an ambulance to transfer the plaintiff to the Hospital for a life threatening emergency, to evaluate abdominal/rib injury and pain."  *Id.* ¶ 12.

Washington arrived at Elmhurst Hospital Center at approximately 3:19 a.m.  *Id.* ¶ 14.  The triage examination found no bruising or redness on his right ribs.  *Id.* ¶ 15.  However, Washington maintains that his injuries were on his left side, consistent with his ultimate diagnosis, and that the triage nurse erred by concentrating on his right side.  *Id.*  Medical records indicate that Washington had "mild swelling to the left superior orbital ridge," with moderate tenderness, and "exquisite tenderness to palpation of the left lower chest wall," with a small superficial abrasion to the left forearm.  *Id.* ¶ 16.  After taking scans of his head and ribs,

Washington was diagnosed with a sprain to his ribs, multiple contusions, and a hematoma (a very large bruise). *Id.* ¶ 17. He was given one dose of Percocet and one dose of ibuprofen at the hospital, but was not prescribed medication upon discharge. *Id.* ¶ 18. He was told to follow up at the clinic on Rikers Island the next day. *Id.*

He returned to Rikers Island at approximately 10:00 a.m. later that morning and brought back to intake, where Captain Smalls was still stationed. *Id.* ¶ 19. At around 11:15 a.m., he was brought to the clinic, where he reported experiencing mild discomfort due to pain and was prescribed a five-day course of ibuprofen. *Id.* ¶ 20. After his exam, he was taken back to intake. *Id.* ¶ 21. Washington reports that he stayed at intake for approximately ten hours, without access to his prescribed ibuprofen. *Id.*; Doc. 63 at II. Afterwards, he was placed in the same dormitory as Meeks for approximately two and a half hours before the two were eventually moved to separate dormitories. Doc. 62 ¶ 21; Doc. 63 at II.

On February 10, 2014, Washington was served with a Report and Notice of Infraction as a result of the altercation. Doc. 62 ¶ 23. According to the notice, he was charged with fighting and with refusal to obey a direct order to stop fighting. *Id.* Washington maintains that he was falsely charged. *Id.* Williams, the investigating official, recommended the charges to the adjudication board for disposition. *Id.* ¶ 24. Washington maintains that this was also done falsely and arbitrarily. *Id.* After a disciplinary hearing—which Washington attended and at which he pled not guilty—he was found not guilty and the infraction was dismissed. *Id.* ¶¶ 25–26. On February 14, 2014, he was served with a Hearing Report and Notice of Disciplinary Disposition, informing him that he was found not guilty, that the infraction had been dismissed, and that he had appellate rights. *Id.* ¶ 27. On February 17, 2014, Williams completed his final investigative report. *Id.* ¶ 33. Washington maintains that, in this report, Williams wrote that "[b]oth inmates were counseled that D.O.C. [Department of Corrections] do [*sic*] not tolerate this type of behavior. When feeling unsafe/threatened to notify any D.O.C. staff member for intervention. Both inmates were infracted. Injuries sustained by both inmates are consistent with an inmate on inmate fist fight." *Id.* ¶ 27. He maintains that, pursuant to this report, "he was

still found to be fighting and disobeying a direct order, even though he was found not guilty." *Id.*

On April 1, 2014, Washington filed a Notice of Claim in connection with the February 2014 incident. *Id.* ¶ 28.

**B. Procedural History**

Washington filed this action on December 8, 2016 and subsequently amended his complaint to add O'Mahony, Truta, Smalls, and the City as Defendants. Docs. 2, 21. O'Mahony, Truta, and the City answered the complaint on May 19, 2017. Doc. 23. Smalls answered the complaint on August 7, 2017. Doc. 33. On July 17, 2017, Washington requested permission to file a second amended complaint. Doc. 30. In his proposed amended complaint, Washington added causes of action under 42 U.S.C. § 1983 ("§ 1983") against all Defendants. *Id.*, Ex. A. Specifically, he brought claims for deliberate indifference to medical care, negligence, denial of pain medication, being wrongly and falsely accused of fighting, negligent and intentional infliction of emotional distress, supervisory liability, and municipal liability. *Id.* In June 2018, Defendants requested permission to depose Washington, which the Court granted. Docs. 38–39. On April 2, 2019, the Court directed the parties to provide a status report, which they did by April 16, 2019. Docs. 40, 43, 45.

Defendants then requested that the Court set a briefing schedule for its anticipated motion for summary judgment. 49. Defendants filed the instant motion for summary judgment on July 10, 2019. Doc. 52. For the first time in his opposition to the motion, Washington raised claims for deliberate indifference to safety, lack of access to the courts, and violation of Department of Correction Rules and Regulations. Read liberally, Washington's papers, taken together, can best be read to bring causes of action under § 1983 for deliberate indifference to medical care against Truta and Smalls, deliberate indifference to safety against O'Mahony and Smalls, false accusation against O'Mahony, violation of Department of Correction Rules and Regulations against O'Mahony, deprivation of access to the courts against O'Mahony; state law claims for negligence and negligent and intentional infliction of emotional distress against all Defendants; and *respondeat superior* liability against the City.

The Court will consider each of these claims in turn.[1]

## II.   LEGAL STANDARD

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact." Fed. R. Civ. P. 56(a). "An issue of fact is 'genuine' if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Senno v. Elmsford Union Free Sch. Dist.*, 812 F. Supp. 2d 454, 467 (S.D.N.Y. 2011) (citing *SCR Joint Venture L.P. v. Warshawsky*, 559 F.3d 133, 137 (2d Cir. 2009)). A fact is "material" if it might "affect the outcome of the suit under the governing law." *Id.* (internal quotation marks and citation omitted).

The party moving for summary judgment is first responsible for demonstrating the absence of any genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Where, like here, "the burden of proof at trial would fall on the nonmoving party, it ordinarily is sufficient for the movant to point to a lack of evidence to go to the trier of fact on an essential element of the nonmovant's claim." *Simsbury-Avon Pres. Club, Inc. v. Metacon Gun Club, Inc.*, 575 F.3d 199, 204 (2d Cir. 2009) (citing *Celotex*, 477 U.S. at 322–23). If the moving party meets its burden, "the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment." *Jaramillo v. Weyerhaeuser Co.*, 536 F.3d 140, 145 (2d Cir. 2008) (citing *Celotex*, 477 U.S. at 322–23).

In deciding a motion for summary judgment, the Court must "construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant." *Brod v. Omya, Inc.*, 653 F.3d 156, 164 (2d Cir. 2011) (internal quotation marks and citation omitted). However, in opposing a motion

---

[1] Defendants request that the Court not consider any claims raised by Washington for the first time in opposition and that it deem waived any arguments to which Washington failed to respond. Doc. 68 at 2–5. They also request that the Court not consider any argument for which Washington has not provided any legal support. *Id.* at 1–2. Given Washington's *pro se* status, the Court denies these requests. As such, it will consider all arguments raised by Washington, regardless of when or how they were raised. However, the Court agrees that evidence of subsequent, unrelated misconduct by Truta is irrelevant to this case and, as such, will disregard it. *Id.* at 10.

for summary judgment, the nonmoving party may not rely on unsupported assertions, conjecture, or surmise. *Goenaga v. March of Dimes Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir. 1995). The non-moving party must do more than show that there is "some metaphysical doubt as to the material facts." *McClellan v. Smith*, 439 F.3d 137, 144 (2d Cir. 2006) (internal quotation mark omitted) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)). To defeat a motion for summary judgment, "the non-moving party must set forth significant, probative evidence on which a reasonable fact-finder could decide in its favor." *Senno*, 812 F. Supp. 2d at 467–68 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256–57 (1986)).

The Second Circuit has made clear that "special solicitude should be afforded pro se litigants generally, when confronted with motions for summary judgment." *Graham v. Lewinski*, 848 F.2d 342, 344 (2d Cir. 1988) (citing *Sellers v. M.C. Floor Crafters, Inc.*, 842 F.2d 639, 642 (2d Cir. 1988)). *Pro se* litigants' submissions "are held 'to less stringent standards than formal pleadings drafted by lawyers.'" *Hughes v. Rowe*, 449 U.S. 5, 9 (1980) (per curiam) (quoting *Haines v. Kerner*, 404 U.S. 519, 520 (1972)); *see also Young v. New York City Dep't of Educ.*, No. 09 Civ. 6621, 2010 WL 2776835, at *5 (S.D.N.Y. July 13, 2010) (noting that the same principles apply to briefs and opposition papers filed by *pro se* litigants. Although "*pro se* status 'does not exempt a party from compliance with relevant rules of procedural and substantive law,'" *Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 477 (2d Cir. 2006) (quoting *Traguth v. Zuck*, 710 F.2d 90, 95 (2d Cir. 1983)), courts read the pleadings and opposition papers submitted by *pro se* litigants "liberally and interpret them 'to raise the strongest arguments that they suggest,'" *McPherson v. Coombe*, 174 F.3d 276, 280 (2d Cir. 1999) (quoting *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994)). The obligation to read a *pro se* litigant's pleadings leniently "applies with particular force when the plaintiff's civil rights are at issue." *Jackson v. NYS Dep't of Labor*, 709 F. Supp. 2d 218, 224 (S.D.N.Y. 2010) (citing *McEachin v. McGuinnis*, 357 F.3d 197, 200 (2d Cir. 2004)). "However, a pro se party's 'bald assertion,' completely unsupported by evidence, is not sufficient to overcome a motion for summary judgment." *Lee v. Coughlin*, 902 F. Supp. 424, 429 (S.D.N.Y. 1995) (quoting *Carey v. Crescenzi*, 923 F.2d 18, 21 (2d Cir. 1991)).

## III.  DISCUSSION

### A.  Section 1983 Claims

"Section 1983 provides a private cause of action for 'the deprivation of any rights, privileges, or immunities secured by the Constitution and laws' of the United states." *Boyland v. Wing*, 487 F. Supp. 2d 161, 167 (E.D.N.Y. 2007) (quoting 42 U.S.C. § 1983).  "Section 1983 'is not itself a source of substantive rights,' but merely provides 'a method for vindicating federal rights elsewhere conferred.'" *Albright v. Oliver*, 510 U.S. 266, 271 (1994) (quoting *Baker v. McCollan*, 443 U.S. 137, 144 n.3 (1979)).

#### 1.  *Deliberate Indifference*

In the instant case, Washington alleges deliberate indifference against O'Mahony, Truta, and Smalls.  He alleges that O'Mahony was deliberately indifferent to his safety when she failed to promptly stop the assault; that Truta was deliberately indifferent to his medical care when he had to wait four hours to be seen at the clinic after the altercation, even though he was complaining constantly of pain; and that Smalls was deliberately indifferent to his medical care when he denied him pain medication upon his return from the emergency room and also deliberately indifferent to his safety when he returned Washington to the same dormitory as his alleged attacker.

Jailed individuals are protected against "deliberate indifference to conditions that pose a substantial risk of serious harm to his physical well-being" by the Eighth Amendment or the Fourteenth Amendment.  *Ortiz v. Dep't of Corr. of City of New York*, No. 08 Civ. 2195 (RJS) (HBP), 2011 WL 2638137, at *4 (S.D.N.Y. Apr. 29, 2011), *report and recommendation adopted sub nom. Ortiz v. Hernandez*, 2011 WL 2638140 (S.D.N.Y. 2011).  "If the individual is a sentenced prisoner, the source of protection is the Eighth Amendment.  If the individual is a pretrial detainee, the source of protection is the Due Process Clause of the Fourteenth Amendment."  *Id.* (citations omitted).  Under the Fourteenth Amendment, deliberate indifference is measured from an objective perspective."  *Smith v. Outlaw*, No. 15 Civ. 9961 (RA), 2017 WL 4417699, at *2 (S.D.N.Y. Sept. 30, 2017) (citing *Darnell v. Pineiro*, 849 F.3d 17, 35 (2d Cir.

2017)).  Because Washington was a pre-trial detainee at the time of the events, his claim will be evaluated under the Fourteenth Amendment.

a.  *Deliberate Indifference to Medical Care*

"To state a claim for deliberate indifference to medical care, Washington must show that (1) he suffered an objectively sufficient "serious medical condition," and (2) the prison official acted with "deliberate indifference to that serious medical need." *Chavis v. Kienert*, No. 03 Civ. 0039 (FJS) (RFT), 2005 WL 2452150, at *22 (N.D.N.Y. Sept. 30, 2005) (citing *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)).  To meet the second prong of this inquiry, a pretrial detainee "can allege either that the defendants *knew* that failing to provide the complained of medical treatment would pose a substantial risk to his health or that the defendants *should have known* that failing to provide the omitted medical treatment would pose a substantial risk to the detainee's health." *Charles v. Orange Cty.*, 925 F.3d 73, 87 (2d Cir. 2019).  "Whether the state knew or should have known of the substantial risk of harm to the detainee is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence." *Id.* (citing *Farmer*, 511 U.S. at 842).

Washington alleges that he was first deprived of adequate medical care when he had to wait four hours to be seen at the clinic on Riker's Island and that he was again deprived of adequate medical care when he was not given pain medication for approximately ten hours before being returned to the dormitory.  The record establishes that Washington suffered injuries to his ribs, head, and arm.  Doc. 62 ¶ 16.  His medical treatment included two doses of pain medication, radiological scans, and, upon returning to Rikers Island, a subsequent five-day course of ibuprofen.  *Id.* ¶¶ 18, 20.

The crux of Washington's claims is that Truta and Smalls were deliberately indifferent to his medical needs is that there was a delay in his medical care, both before being sent to the hospital and immediately afterwards.  There are no allegations that the treatment itself was insufficient.  "When the basis for a prisoner's claim 'is a temporary delay or interruption in the provision of otherwise adequate medical treatment,' this Court examines whether the delay itself

created a risk of harm." *Valdiviezo v. Boyer*, 752 F. App'x 29, 32 (2d Cir. 2018) (quoting *Smith v. Carpenter*, 316 F.3d 178, 185–86 (2d Cir. 2003)). "In considering whether a delay caused a risk of harm, a court may consider the absence of adverse medical effects or demonstrable physical injury." *Id.* (internal quotation marks and citation omitted). Here, there are no allegations that Washington's injuries were in any way exacerbated or made worse by either Truta's or Small's delay. Although the Court appreciates that Washington was in pain during this time, his "cannot be characterized as a condition of 'urgency' that mandated more swift treatment than [he] received." *Ford v. Rodriguez*, 15 Civ. 4909 (PAC) (GWG), 2016 WL 6776345, at *5 (S.D.N.Y. Nov. 16, 2016). Therefore, Washington has failed to establish that he had a serious medical condition so as to maintain a claim for deliberate indifference to medical care. *See, e.g.*, *id.* (collecting cases).

### 2. *Deliberate Indifference to Safety*

"The Constitution imposes a duty on prison officials to 'take reasonable measures to guarantee the safety of the inmates.'" *Luckey v. Jonas*, 18 Civ. 8103 (AT) (KNF), 2019 WL 4194297, at *3 (S.D.N.Y. Sept. 4, 2019) (quoting *Farmer*, 511 U.S. at 832)). "In particular, a prison official has a duty to protect prisoners from violence from other prisoners." *Nunez v. Goord*, 172 F. Supp. 2d 417, 430 (S.D.N.Y. 2001). To establish a claim for deliberate indifference to safety, plaintiffs must show "(1) that the failure to intervene or protect the inmate was sufficiently serious such that it caused an unquestioned and serious deprivation of basic human needs and (2) that the defendant acted with a sufficiently culpable state of mind." *Corley v. City of New York*, 14 Civ. 3202 (GHW), 2017 WL 4357662, at *12 (S.D.N.Y. Sept. 28, 2017) (internal quotation marks and citation omitted).

To establish the first prong, "the focus of inquiry must be, not the extent of the physical injuries sustained in an attack, but rather the existence of a substantial risk of serious harm." *Blake v. Kelly*, No. 12 Civ. 7245 (ER), 2014 WL 4230889, at *5 (S.D.N.Y. Aug. 26, 2014) (internal quotation marks and citation omitted). "A substantial risk of serious harm can be demonstrated where there is evidence of a previous altercation between a plaintiff and an

attacker, coupled with a complaint by plaintiff regarding the altercation or a request by plaintiff to be separated from the attacker." *Gilmore v. Rivera*, No. 13 Civ. 6955 (RWS), 2014 WL 1998227, at *3 (S.D.N.Y. May 14, 2014). However, in certain circumstances, such claims can also exist "in the absence of any allegation of a history of altercations between plaintiff and his attacker." *Blake*, 2014 WL 4230889, at *5.

Washington's deliberate indifference to safety claims stem from O'Mahony's alleged failure to protect him from his attacker(s), as well as from Smalls's decision to return him to the same dormitory as Meeks for a period of two and a half hours. The attack on Washington can only be described as a "surprise attack." There are no allegations of previous altercations between Washington and any other inmate; nor is there any indication that he and Meeks even knew each other. "Courts in this Circuit routinely deny deliberate indifference claims based on surprise attacks." *Franzese v. City of New York*, No. 17 Civ. 3020 (AJN), 2018 WL 5924354, at *3 (S.D.N.Y. Nov. 13, 2018) (collecting cases). "This is because in a surprise attack, it is difficult to infer that a corrections officer would have known, or should have known, of a risk to the plaintiff." *Id.* Yet, courts have also held that "[a] 'surprise attack,' . . . is only a surprise for so long." *Luckey*, 2019 WL 4194297, at *4. However, to the extent Washington claims that O'Mahony did not react quickly enough to the attack, the facts of this case do not support such a theory. Here, the entire altercation lasted approximately two minutes. During that time, O'Mahony, who was stationed on the opposite end of the room, noticed the attack, gave several verbal warnings, activated her personal body alarm, and waited for back-up officers to arrive. These actions all necessarily occurred within a short period of time. These facts do not suggest in the least that O'Mahony "witnessed the attack on plaintiff and . . . failed to take action to prevent it." *Taylor v. City of New York*, No. 16 Civ. 7857 (NRB), 2018 WL 1737626, at *12 (S.D.N.Y. Mar. 27, 2018).

As to Washington's suggestion that O'Mahony was not at her post at the time of the incident, this is unsupported by the record. Washington has maintained throughout this litigation that he was asleep at the time the attack occurred. There is no way Washington would have first-

hand knowledge that O'Mahony was not at her post at the time; nor does he offer any evidence to support this proposition. Furthermore, even if O'Mahony were away from her post at the time, this constitutes, at most, a claim for negligent supervision, which "is not sufficient for liability under § 1983." *Grant v. Burroughs*, 96 Civ. 2753 (MGC), 2000 WL 1277592, at *3 (S.D.N.Y. Sept. 8, 2000). Washington's claims against O'Mahony, then, are insufficient as a matter of law.

His claims against Smalls are similarly infirm. There are no facts to suggest that Smalls knew who Washington's attackers were, or to indicate that Washington requested to be separated from his attackers. To the extent Washington raises any claims against Smalls for deliberate indifference to safety, these claims fail as well.

### 3. False Accusation

Washington next argues that O'Mahony wrongly and falsely accused him of being a participant in the altercation, rather than its victim. He maintains that, as a result of this false accusation, he was punished "by being kept in the intake area for four hours without any medical care or knowledge that he was being falsely accused of fighting." Doc. 63 at 4. He also raises discrepancies between O'Mahony's report of the incident—which states that he was being punched in the back by one inmate—and his actual injuries, which included only injuries to the front part of his body, as well as between his recollection of being assaulted by multiple inmates. However, these disputes do not go to a material fact. Even assuming everything Washington asserts is true, it is well-settled that "prison inmate[s] ha[ve] no constitutionally guaranteed immunity from being falsely or wrongly accused of conduct which may result in the deprivation of a protected liberty interest." *Freeman v. Rideout*, 808 F.2d 949, 951 (2d Cir. 1986). "As long as prison officials grant the inmate a hearing and an opportunity to be heard, the 'filing of unfounded charges d[oes] not give rise to a *per se* constitutional violation actionable under section 1983." *Franco v. Kelly*, 854 F.2d 584, 587 (2d Cir. 1988) (quoting *Freeman*, 808 F.2d at 953). The Second Circuit has therefore found that "the key inquiry in assessing an allegation that an inmate has been found guilty of false disciplinary charges is whether or not the prison has provided the inmate with the minimum procedural due process protections guaranteed by the

Fourteenth Amendment." *Id.* Here, there are no allegations that Washington was not afforded basic procedural protections. Indeed, he not only had a hearing, but was cleared of all charges. "The issuance of false misbehavior reports and provision of false testimony against an inmate by corrections officers is insufficient on its own to establish a denial of due process." *Mitchell v. Senkowski*, 158 F. App'x 346, 349 (2d Cir. 2005). Washington's claims for false accusations against O'Mahony, then, do not rise to the level of a constitutional violation for purposes of § 1983.

### 4. Violation of Department of Correction Rules and Regulations

Washington also argues that O'Mahony failed to abide by the Department of Correction's Rules and Regulations when she filed the allegedly false report. "But a violation of procedural rules or regulations, without more, is not enough to establish a *federal constitutional claim*." *Rasheen v. Adner*, 356 F. Supp. 3d 222, 238 (N.D.N.Y. 2019); *see also Cerbelli v. City of New York*, 99 Civ. 6846 (ARR) (RML), 2008 WL 4449634, at *10 (E.D.N.Y. Oct. 1, 2008) ("[L]ocal agency-established policies . . . do not establish constitutional standards." (citing *Poe v. Leonard*, 282 F.3d 123, 145–46 (2d Cir. 2002)). This claim, then, must also fail.

### 5. Deprivation of Access to the Courts

Finally, Washington claims that O'Mahony's allegedly false narrative deprived him of access to the courts. In particular, he appears to allege that O'Mahony's failure to identify his multiple attackers prevented him from filing charges against these attackers. "[T]he fundamental constitutional right of access to the courts requires prison authorities to assist inmates in the preparation and filing of meaningful legal papers by providing prisoners with adequate law libraries or adequate assistance from persons trained in the law." *Bounds v. Smith*, 430 U.S. 817, 828 (1977), *abrogated in part on other grounds by Lewis v. Casey*, 518 U.S. 343 (1996). However, such a claim requires prisoners to "demonstrate that the alleged shortcomings in the library or legal assistance program hindered his efforts to pursue a legal claim." *Lewis*, 518 U.S. at 351. In other words, plaintiffs must show "actual injury." *Id.* at 349. "To state a claim for denial of access to the courts . . . a plaintiff must allege that the defendant took or was

responsible for actions that hindered [the plaintiff's] efforts to pursue a legal claim." *Davis v. Goord*, 320 F.3d 346, 351 (2d Cir. 2003) (internal quotation marks and citations omitted).

Here, Washington has stated neither that he does not have access to an adequate law library nor that he lacks adequate legal assistance. Instead, he claims that he was injured by O'Mahony's "false narrative," because he was unable to bring suit against his supposed multiple attackers. Washington's allegations do not constitute a recognized basis for an access-to-the courts claim. Even if they did, Washington has failed to show injury. Washington was well-aware of at least one of his attackers—Meeks. Therefore, had he wanted to bring suit on the basis of his attack, he could have, at the very least, sued Meeks and later joined any other attackers that came to light. Moreover, as discussed above, Washington does not have a "constitutionally guaranteed immunity from being falsely or wrongly accused of conduct which may result in the deprivation of a protected liberty interest." *Freeman*, 808 F.2d at 951. The Court will therefore grant Defendants' motion for summary judgment on this claim as well.

### 6. Municipal Liability

To state a § 1983 claim against a municipality, like the City, plaintiffs must allege facts showing: "(1) the existence of a municipal policy, custom, or practice, and (2) that the policy, custom, or practice caused the violation of the plaintiff's constitutional rights." *Jean v. AMKC C95 Intake*, 18 Civ. 3294 (CM), 2018 WL 10408875, at *2 (S.D.N.Y. May 15, 2018) (citing *Bd. of Cty. Comm'rs of Bryan Cty. v. Brown*, 520 U.S. 397, 403 (1997); *Jones v. Town of East Haven*, 691 F.3d 72, 80 (2d Cir. 2012)). Washington has failed not only to allege any violation of his constitutional rights, as discussed above, but also any City policy, custom, or practice that caused any such violation. As such, a § 1983 cause of action against the City cannot lie.

### B.  State Law Claims

Washington also brings claims for negligence and for negligent and intentional infliction of emotional distress.[2]  Under 28 U.S.C. § 1367(c)(3), the Court may decline to exercise jurisdiction over any non-federal claims over which it could have supplemental jurisdiction if the Court has dismissed all of the claims over which it has original jurisdiction.  Subject matter jurisdiction in the instant action is based on federal question, 28 U.S.C. § 1331, and the jurisdictional counterpart to § 1983, 28 U.S.C. § 1343.

Having disposed of all of Plaintiff's federal claims, it would be inappropriate to adjudicate the remaining state law claims.  Therefore, the Court declines to retain jurisdiction over the remaining state law claims and dismisses them without prejudice. *See United Mine Workers v. Gibbs of Am.*, 383 U.S. 715, 726 (1966) ("[I]f the federal claims are dismissed before trial . . . the state claims should be dismissed as well.").

## IV.    CONCLUSION

For the foregoing reasons, the Court GRANTS Defendants' Motion for Summary Judgement on all of the federal claims.  It declines to retain supplemental jurisdiction over the remaining state law claims and therefore DISMISSES those claims without prejudice.  The Clerk of Court is respectfully directed to terminate this motion, Doc. 52, to enter judgment in favor of Defendants, and to close this case.

SO ORDERED.

Dated:    March 18, 2020
             New York, New York

EDGARDO RAMOS, U.S.D.J.

---

[2] Washington brings his negligence claims under § 1983.  However, because negligence is insufficient to support a § 1983 claim, the Court will interpret these claims as state law claims.  *See Hayes v. New York City Dep't of Corr.*, 84 F.3d 614, 620 (2d Cir. 1996).